# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3551-12T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES J. MAUTI,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

January 26, 2017

APPELLATE DIVISION

Argued October 7, 2015 — Decided  January 26, 2017

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 07-11-0955.

Joseph A. Hayden, Jr., argued the cause for appellant (Walder Hayden P.A., attorneys; Mr. Hayden, Alan Silber and Lin C. Solomon, on the brief).

Kimberly L. Donnelly, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Grace H. Park, Acting Union County Prosecutor, attorney; Ms. Donnelly, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In 2007, a Union County grand jury returned Indictment No. 07-11-0955, charging defendant James J. Mauti with first degree aggravated sexual assault, N.J.S.A. 2C:14-2a(7); second degree sexual assault, N.J.S.A. 2C:14-2c(1); third degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3a; and fourth degree criminal sexual contact, N.J.S.A. 2C:14-3b. At all times relevant to this case, defendant was a physician licensed to practice in this State; his practice includes internal and sports medicine. The complaining witness is defendant's sister-in-law, "Joanne."[1] The incident that prompted these criminal charges occurred on November 25, 2006.

This is the second time this case has been before this court. In State v. Mauti, 416 N.J. Super. 178, 181 (App. Div. 2010), aff'd, 208 N.J. 519 (2012) (Mauti I), we granted defendant's motion for leave to appeal and reversed the Criminal Part's pretrial ruling, which applied the Supreme Court's holding in In re Kozlov, 79 N.J. 232, 243—44 (1979), to pierce the spousal privilege provided by N.J.R.E. 501(2) and compel defendant's wife to testify as a witness for the State.

---

[1] This name is fictitious, as are all the names of Joanne's family members who are mentioned in the record of this case. We do this to protect the privacy of "alleged victims of sexual abuse." R. 1:38-3(c)(12).

A-3551-12T3

The trial began on October 24, 2012, and proceeded over sixteen non-sequential days, ending on December 11, 2012. The jury found defendant guilty of third degree aggravated criminal sexual contact and fourth degree criminal sexual contact, but acquitted defendant of first degree aggravated sexual assault and second degree sexual assault. The trial judge denied defendant's motion for a new trial pursuant to Rule 3:20-1, sentenced defendant to serve 364 days in the Union County Correctional Facility,[2] imposed the mandatory fines and penalties, permanently restrained defendant from having any contacts with the victim, and directed defendant to register as a convicted sex offender pursuant to N.J.S.A. 2C:7-2. The trial judge also denied defendant's motion to stay the execution of the sentence pending appeal.

By order dated April 12, 2013, we granted defendant's motion to be admitted to bail pending appeal. R. 2:9-4. In reaching this decision, we noted this appeal raised "at least one substantial question [of law] that should be determined by an appellate court." We thus remanded the matter to the Criminal

---

[2] Although our decision to remand for a new trial obviates a need to review the sentence, we are compelled to note that a sentence of 364 days in a county correctional facility is not authorized by N.J.S.A. 2C:43-6a. See State v. Crawford, 379 N.J. Super. 250, 257 (App. Div. 2005). A court may impose a term of imprisonment of less than three years for a third degree offense only as a condition of probation. State v. Hartye, 105 N.J. 411, 419 (1987).

Part to allow the trial judge "to set a reasonable bail amount and reasonable conditions of bail pending appeal."

In this appeal, defendant raises three principal issues predicated on evidential rulings made by the trial judge in the course of addressing the parties' pretrial motions. Defendant argues: (1) the trial court erred when it allowed the State to introduce a towel containing defendant's semen because this DNA material lacked a proper evidential foundation, constituted an inadmissible hearsay statement under N.J.R.E. 801(a)(2), and should have been excluded under N.J.R.E. 403 because its prejudicial effect far outweighed its probative value; (2) the trial judge abused his discretion when he permitted the State to present cumulative "fresh-complaint" evidence to bolster the credibility of the complaining witness; and (3) the trial court erroneously admitted into evidence a redacted version of a letter sent by defense counsel to the prosecutor before formal charges were filed against defendant. The court ruled certain factual assertions defense counsel made in this letter constituted adopted admissions by defendant under N.J.R.E. 803(b). Defendant argues these factual assertions were protected under N.J.R.E. 410 as statements "made during plea negotiations." Alternatively, defendant argues the court should have excluded the letter in its entirety under N.J.R.E. 403.

After carefully reviewing the record developed before the trial court, we are compelled to reverse defendant's convictions and remand this matter for a new trial on the charges of third degree aggravated criminal sexual contact and fourth degree criminal sexual contact. We are satisfied the trial court should have excluded the towel containing defendant's semen because the State failed to present competent evidence linking it to the incident involving Joanne. Furthermore, defendant's wife, "Jean," gave the towel to her father in response to his request "[t]o get whatever is in that room in the part of the house where, according to [Joanne], it took place." Because Jean did not testify in this trial, admitting the towel into evidence improperly allowed the jury to draw an inference of defendant's culpability from Jean's unexplained conduct, in violation of N.J.R.E. 801(a)(2). The DNA evidence the State extracted from the towel should have been excluded as irrelevant under N.J.R.E. 401 because Joanne never claimed defendant ejaculated during the alleged assault.

We also conclude the trial judge abused his discretion by permitting the State to call five fresh-complaint witnesses without providing the jury with any instructions on how to consider this limited-purpose testimony. As our Supreme Court recently reaffirmed in State v. R.K., 220 N.J. 444 (2015), the fresh-complaint doctrine allows the State to present "evidence of a

victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." Id. at 455. The type of cumulative fresh-complaint testimony the State presented here is inconsistent with the Court's holding in R.K. because it had the capacity to improperly bolster the credibility of the complaining witness. Id. at 456. The judge also committed reversible error when he failed to charge the jury on the limitations of fresh-complaint testimony.

Finally, we conclude that the trial court properly admitted a redacted version of defense counsel's letter to the prosecutor as an adopted admission under N.J.R.E. 803(b). The record shows defense counsel included in this letter a detailed description of the medical treatment defendant provided to Joanne on November 25, 2006, including the specific medications he administered to her. Defense counsel wrote this letter with the intent and expectation that it would persuade the prosecutor to accept defendant's version of events as truthful and thereby convince the State not to file formal criminal charges against defendant. Under these circumstances, we hold defense counsel's letter falls outside the ambit of "plea negotiations," as that term is used in N.J.R.E. 410.

A-3551-12T3

We will recite only the facts necessary to provide context for our analysis of the legal issues defendant raises on appeal.

I

A

Joanne was thirty-eight years old when she testified before a jury about being sexually assaulted six years earlier by her sister's then boyfriend. Defendant has known Joanne's family for most of his life. He befriended Joanne's older brother, "Joseph," in elementary school and started dating Joanne's older sister, "Jean," in 1996. Defendant and Jean married on October 28, 2007.[3] They had four children when this trial began in 2012.

Defendant is a physician who practices internal and sports medicine. He operates his medical practice from a residential building he purchased in 2004. Defendant also lives in the building. The home-office arrangement has two discrete sections that permit defendant to separate his living quarters from his medical practice.

Joanne began working for defendant as a bookkeeper sometime at the start of 2006. Before the November 25, 2006 incident which

---

[3] The State filed an order to show cause in the Civil Part seeking to enjoin defendant and Jean from marrying until the resolution of the pending criminal charges. The trial court denied the State's application. We thereafter denied the State's emergent application for the imposition of temporary restraints to prevent the wedding. Mauti, supra, 416 N.J. Super. at 186.

gave rise to these criminal charges, defendant served as a family doctor for Joanne, her two parents, and Joseph, among other family members. Defendant testified that despite Joanne's allegations, all of his wife's family members continue to see him as their family doctor, including Joseph and his wife. Defendant testified he treats every member of the family without charge.

Joanne testified she began seeing defendant as her physician when he first opened his private practice in 2005, even before she began working for him as a bookkeeper. She saw him as a patient approximately a dozen times, "[m]ostly [for] sinus infections and colds." She testified defendant did not treat her inappropriately during this time period.

Defendant and Joanne both testified that he treated her for back pain without incident on November 21, 2006, and on November 24, 2006. However, they differ regarding the frequency, extent, and specifics of the treatment. Defendant neither created a contemporaneous record of the treatment he administered to Joanne in November 2006, nor dictated "a dated entry for later transcription," as required by the Board of Medical Examiners. See N.J.A.C. 13:35-6.5(b). Although defendant recognized this obligation, he testified he did not create records when he treated Joanne because she was not a "scheduled patient." Defendant claimed he planned to eventually input the records. Springfield

Police Detective Judd Levenson testified that he reviewed the medical records defendant turned over in October 2012, but did not find any records pertaining to Joanne's treatment in November 2006.

According to defendant, he did not learn of the criminal charges Joanne had filed against him until December 2, 2006. Even after defendant learned of Joanne's allegations against him, he did not prepare a complete record because he was "distraught" and "didn't know what to do." Defendant testified he eventually retained an attorney and decided "not to alter the records in any way and to leave them as they were." The medical treatment that defendant failed to document was not limited to what occurred on November 25, 2006. Both defendant and Joanne agree that the medical interactions began four days earlier.

On November 21, 2006, Joanne told defendant she felt pain in her lower back. Defendant asked Joanne to lie down on the floor of his living room so he could perform an osteopathic manipulation of her lower back. Defendant next moved her to an examination room located in the medical office side of the building. Defendant testified he gave Joanne three forms of medications to take home: (1) Tizanidine, a muscle relaxer; (2) Ultracet, a pain medication; and (3) Prednisone, an anti-inflammatory. According to defendant, instead of writing a prescription, he gave these medications

directly to Joanne in pill form from the samples he kept in the office.

Joanne acknowledged that defendant performed an osteopathic manipulation of her back on November 21, 2006, which she described as "crack[ing] [her] back." She testified the procedure alleviated her pain. Joanne also testified that defendant "massaged a knot out of [her] back" in one of the examination rooms on the medical office side of the building. She described it as a "deep-tissue massage." Defendant used his fingers, "digging in to try to loosen up the knot." Defendant did not behave inappropriately that day. Joanne testified she returned to work after her pain subsided.

According to defendant, on Thursday, November 23, 2006, Joanne "said her back was still bothering her." Defendant testified this was the day he decided to give her a "TENS unit," which he described as a "portable electric stimulation unit." The TENS unit supplemented the three medications he had given her on November 21, 2006. However, Joanne again complained of back pain when she returned to work the next day. Defendant testified he offered to treat her again with the same medications. He also "explained to her that he would do a hot pack treatment similar to what they do in physical therapy." Defendant testified he treated Joanne in examination room three, where he administered hot pack treatments.

When this course of treatment proved ineffective, defendant injected Joanne with six cubic centimeters (cc's) of a "Marcaine solution." Defendant's account of Joanne's reaction to this course of treatment conflicted with Joanne's testimony of the same event. Defendant testified that Joanne "was getting very anxious" about receiving the injection. When defendant injected her, Joanne had a vasovagal reaction[4] and passed out.

Although Joanne acknowledged that she gets anxious immediately before she is about to receive an injection, she denied that defendant ever told her he was giving her anything to alleviate her anxiety. She also denied that she passed out on Friday, November 24, 2006. According to Joanne, she had, at worst, felt "lightheaded."

B

November 25, 2006, was the Saturday immediately after Thanksgiving. Defendant's medical office was closed for the extended holiday weekend, but Joanne worked that day. She arrived

---

[4] "Vasovagal syncope . . . occurs when you faint because your body overreacts to certain triggers, such as the sight of blood or extreme emotional distress. It may also be called neurocardiogenic syncope. The vasovagal syncope trigger causes your heart rate and blood pressure to drop suddenly. That leads to reduced blood flow to your brain, causing you to briefly lose consciousness." Mayo Clinic Staff, Vasovagal Syncope, Mayo Clinic (Feb. 12, 2016), http://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/hosme/ovc-20184773.

A-3551-12T3

at defendant's home-office at approximately 10 a.m. and had breakfast with her sister, Jean. She sat down to begin to work approximately fifteen to twenty minutes later. Joanne testified that she experienced "discomfort" in her lower back "almost immediately" after she sat down to start work. She described it as "the same type of pain" she had experienced throughout the week. When asked to rate the level of pain on a scale from one to ten, she stated it was "maybe about a 4, 3, 4."

Although she had never before left work due to her lower back pain, she decided "to go home and not allow it to get worse." According to Joanne, defendant offered to treat her when she told her sister she was going home because of her back pain. Before this, Joanne had not interacted with defendant that day. Joanne did not recall exactly when defendant began treating her, but estimated it was probably before noon. Based on telephone records, the attorneys agreed on the following timeline: (1) Joanne arrived at defendant's residence-medical office at 10:49 a.m.; (2) she worked for approximately one hour, until 11:49 a.m., when her back began to bother her; and (3) treatment began sometime in the afternoon.

All of the previous treatments had lasted one to two hours. Joanne testified she expected this treatment to last "[m]aybe an hour, max." She would have declined defendant's offer to treat

12                                                    A-3551-12T3

her if she had thought it would take longer than one hour because she planned to meet her boyfriend later that afternoon. The treatment took place in exam room two, located in the medical office side of the building.

Joanne was fully dressed when defendant walked into the room and gave her two pills: a muscle relaxer and a pain reliever. He also gave her a liquid. According to Joanne, defendant told her the liquid was a muscle relaxer. This was the first time defendant had given her this medication. He did not identify the liquid by name or explain to her the effects of this medication. Defendant gave her the liquid in a "Dixie cup." The liquid was "cloudy white" and had the consistency of "Pepto Bismol." Except for the liquid, this was the same medication defendant had previously given her on Thanksgiving Day.

Joanne testified that after taking the liquid she "almost immediately became unaware." She gave the following account of what transpired after taking the liquid.

> Q. What do you remember happening after you drank the liquid?
>
> A. He — I was woken up and given a second dosage.
>
> Q. And when he woke you up to give you a second dosage, did you ask about that?
>
> A. Yes, I did.

Q. What did you say?

A. I asked him why a second dosage, and he said that it was a series of three dosages, and that was the second.

Q. Do you remember ever getting a third dosage?

A. No.

Joanne testified that she changed into a pair of shorts, but does not remember the reasons for doing it. She described the shorts as "knee length" or "maybe a little bit shorter[.]" Joanne testified that defendant gave her the shorts. She said defendant told her he needed her to wear the shorts because "he wanted to crack [her] back." She did not recall whether she kept her underpants on after she changed into the shorts.

Joanne remembered Jean coming into the exam room to show her Christmas decorations before defendant administered the injection. Joanne described this interaction as Jean's attempt to relax and "entertain" her, because Jean knew "shots make [her] nervous." Joanne emphasized, however, that she interacted with Jean before defendant gave her the Dixie cup containing the liquid.

Joanne testified she "barely even felt" the injection defendant administered in her back. She was lying face down on a patient table at this time. After injecting her, defendant commented, "[Y]ou hardly even felt that, [did] you[?]" Defendant

14

then placed hot towels on Joanne's back and began massaging her lower back area. At one point, Joanne testified defendant's "hands began to massage [her] buttocks, and then he would quickly bring them back up, and then lower them back down and then quickly bring them back up."

Joanne recalled defendant "tugging" on her shorts' drawstring, pulling down her shorts, and "stick[ing] his fingers inside [her]." When asked by the prosecutor to specify, she stated, "He was putting them in my anus." She testified the medication prevented her from knowing how long this part of the sexual assault lasted. She stated, "I was fading in and out. I only had glimpses of feelings and what was happening." Joanne testified she "felt motionless" during the time defendant was "placing hot towels [on her] or putting his fingers in [her] anus." She does not remember defendant saying anything to her during this time. According to Joanne, defendant not only digitally penetrated her when she was on her stomach, but also inserted his penis into her anus.

Joanne testified that defendant "flipped [her] onto [her] back."[5] She explained she felt "[h]e was trying to position [her]

_____

[5] Joanne testified that in 2006, she weighed between 125 and 130 pounds. She is 5' 8" tall. Defendant was "probably over 200" pounds and is 6' 1" or 6' 2."

to make it more comfortable for himself."[6]  According to Joanne, defendant "began to insert [his] fingers in [her] vagina."  She also described defendant's movements.  When asked by the prosecutor to describe what she was thinking, Joanne testified that due to the effect of the drugs, she "wasn't thinking right."

Joanne also testified to hearing a sound "like pictures were being taken."  She heard this "snapping" sound approximately three or four times.  She was not certain whether the sounds were in a series or in quick succession.  She testified that at the time of the incident, defendant had a cellphone or other device capable of taking digital photographs.

Joanne also claimed defendant "lifted up her blouse," and "kissed both [her] breasts . . . sensually, like a person that was in the process of love making would kiss another person."  Although she did not hear anything to indicate that a person or persons were near exam room two during the sexual assault, she remembered defendant "scurrying to the door."  She did not know what caused defendant to take this action.  She does not remember whether defendant returned to the exam room afterward.

---

[6] Defense counsel objected, arguing the witness's testimony constituted a conclusion of defendant's intent.  The trial judge overruled the objection, explaining the statement was based on Joanne's perception of defendant's conduct.

Joanne next remembered "standing in the living room and watching [her] sister put up Christmas ornaments." Although she was wearing her own clothes, which comprised a pair of yoga pants, a T-shirt, and a zippered vest, she does not remember waking up in the exam room or dressing herself. She did not know what time it was and felt like she was "swaying." She also felt anxious and eager to go home. Her sister Jean insisted that she eat something. However, when she took a bite of a sandwich Jean had prepared for her, she felt nauseous. She rushed to the bathroom, but was unable to vomit. Jean and defendant both followed her towards the bathroom. She heard defendant say, "I know it's not the drugs I gave her."

Defendant drove Joanne home in her car. Joanne could not remember whether she agreed to have defendant drive her home. She does not recall defendant saying anything to her during the drive home. She remembered that he reached across her to adjust the seat or the seatbelt. Defendant brushed his hand slowly across both of her thighs in a manner she considered to have been an "intentional sexual gesture." Defendant walked with her to the apartment building and kissed her on the cheek "like any other day." The kiss on the cheek is a customary gesture in her family.

Joanne lived with her boyfriend, "Mark," at the time. According to Joanne, Mark was laying on the sofa when she walked

A-3551-12T3

inside the apartment.  "[H]e stood up, and I could tell he was angry with me[.]  . . . [H]e left shortly after I arrived home. He gave me a kiss goodbye and went to work."  Before he left, Mark told her that Ana M. and Cristina P., her two closest girlfriends, had called.  She did not say anything to Mark about the alleged assault.  Joanne called Ana and Cristina back that day, but spoke to each woman for less than five minutes.  She then fell asleep on the sofa and slept for the rest of the day.  Her next clear recollection was waking up at around 11 a.m. on Sunday, November 26, 2006.

<u>C</u>

Defendant testified in his own defense.  We will limit our recitation of his testimony to areas in which his account of material events diverged from Joanne's account.  According to defendant, at approximately 12:30 p.m. on Saturday, November 25, 2006, Joanne told him her lower back pain had returned.  She asked him to provide the same treatment he had performed previously.

Defendant told Joanne to go into one of the exam rooms.  She selected exam room two.  In response to his questions, Joanne confirmed she had not taken the medications he had given her earlier in the week.  Thus, in addition to providing heat treatment and back manipulations, defendant gave Joanne Tizanidine, a muscle relaxer; Ultracet, a pain reliever; and a "facet injection."  This

was the first time defendant had given Joanne a facet injection. Defendant explained that "a paravertebral facet injection . . . is similar to the trigger point injection, just deeper and closer to the spine area[.]"

Although the facet injection was deeper than the one he had administered the previous day, defendant told Joanne "it should alleviate [her] pain and [she] should be fine." He noticed Joanne was "a little apprehensive." Given Joanne's history involving vasovagal syncope, defendant decided to give her chloral hydrate, a liquid sedative. He simultaneously administered the chloral hydrate and the other medications. He then suggested that Joanne change into shorts, so he could perform the massages and manipulations.

Defendant testified he left the room to allow her to change in private. He claimed Joanne fell asleep after he finished the hot packs and massage treatment. He testified Joanne turned herself from lying on her stomach to lying on her back between 3 p.m. and 4:30 p.m. He and Jean agreed to check on her periodically during this time. According to defendant, the treatment protocol began at approximately 1 p.m., and he treated her "for a couple of hours" throughout the day. When he returned to the exam room to check on Joanne's condition at approximately 4:20 p.m., she was sitting in a chair. It was at this time that he administered the

19

second dose of medication, which consisted of pain medication and Tizanidine, a muscle relaxer. Defendant denied giving Joanne a second dose of chloral hydrate.

Defendant testified Joanne got up at approximately 7 p.m., which is when she saw defendant and Jean putting up Christmas decorations. Defendant testified that Joanne seemed "tired," "fatigued," and "a little unsteady." Jean made Joanne a sandwich, but she was unable to eat it. She ran into the bathroom after taking a bite, saying she felt nauseous. Jean went into the bathroom to check on her condition while he went downstairs. Defendant denied saying that the drugs he had given her were not responsible for her nausea. On cross-examination, defendant acknowledged that one of the most common side effects of chloral hydrate is nausea.

Defendant described Joanne's condition at this point in time as "somewhat awake" but not "sharp" enough to drive. He offered to drive her home with Jean following in her car. He assisted Joanne with her seatbelt, but denied making any gesture or doing anything that could be construed as inappropriate sexual conduct. Joanne did not want defendant or Jean to come into her apartment because "she was living with somebody." Defendant testified that he called Joanne's cell phone at 8:21 p.m. to make sure she had

made it safely into her apartment.  He denied sexually assaulting, molesting, or inappropriately touching Joanne.

D

Several members of Joanne's family were present in defendant's office and residence at the time defendant allegedly sexually assaulted her.  Joseph, Joanne's brother, testified as a witness for the State.  He injured his back on the morning of November 25, 2006, when he "tried to pick up a fish tank with water in it."  He called Jean sometime after 12 p.m. to find out if defendant could treat his pain.

Defendant testified he remembered Joseph arriving at his office shortly before 3 p.m.  He told Joseph he was also treating Joanne in exam room two that day.  Joseph testified that the door to exam room two was opened "a crack" when he first came into the office.  The distance between the door to exam room two and the door to exam room four, where defendant treated Joseph, was approximately four feet.  Defendant closed the door to exam room two immediately after telling Joseph his sister was in that room.[7]

---

[7] At trial, Joseph initially testified he did not remember what defendant did after he told him Joanne was in exam room two.  The prosecutor confronted Joseph with a statement he gave to police investigators nearly ten years earlier to refresh his recollection.

21

Joseph did not find it "odd" for defendant to close the door to Joanne's exam room while he was treating her.

Joseph complained of lower back pain. Defendant asked Joseph to lift his shirt and proceeded to massage his lower back. Defendant applied hot towels and gave Joseph "two pills," which Joseph claimed were a pain killer and a muscle relaxer. The hot towels and massage treatment lasted about five or ten minutes. Joseph fell into a sleep-like state in the exam room for approximately ninety minutes. On cross-examination, Joseph testified he was not completely asleep. He remembered hearing footsteps and believed it was defendant coming into the room to check on him. However, his head was turned away from the door and he could not say definitively if they were defendant's footsteps or Jean's.

While defendant was treating Joanne and Joseph, Jean temporarily left the residence/medical office to purchase household items at a local Pathmark. Witnesses disagreed on the precise amount of time it took Jean to complete this task and return home. According to defendant, Jean was gone for approximately twenty-five minutes. A Pathmark receipt reveals Jean's checkout time was 3:21 p.m.

At 3:14 p.m., Jean received a telephone call from her paternal uncle "Nick." He told Jean that he was on his way to her

22

home with his wife and his mother. Nick testified Jean told him she was paying for groceries at Pathmark at the time. She nevertheless told him to "come right over" because Pathmark was "only about a quarter of a mile away from her house." Nick called Jean when he arrived to ask her about the best way to enter the house with his mother, who was suffering from Alzheimer's disease. Although Jean did not initially answer the phone, she called him back at 3:42 p.m. and let them in through the garage.

Nick testified that the door to exam room two was closed. Although the door to Joseph's exam room was slightly ajar, it was not to the point where he could see inside. Nick saw defendant using the computer in his office when they arrived. They spoke to him briefly and then walked to the kitchen without him. Nick described defendant's demeanor as normal. Nick and his family were in defendant's house for slightly more than one hour.

Joseph did not hear Jean return from Pathmark. Nor did he hear Nick and Nick's mother arrive and walk past his exam room. Joseph testified that he joined his uncle, aunt, and grandmother in the kitchen when defendant woke him sometime after 4 p.m. Defendant joined them in the kitchen soon thereafter. In response to Joseph's question, defendant said Joanne was still asleep.

Joseph testified his back felt much better when he woke up. He did not experience drowsiness, nausea, or any other side effects

23

from the medication. Shortly before leaving at approximately 4:20 p.m., Joseph saw defendant playing a computer game in his office. On cross-examination, Joseph stated defendant appeared to be speaking and acting normally. Joseph telephoned Jean later that evening to thank defendant for his treatment. In the course of this conversation, Joseph learned that Joanne was still sleeping.

Defendant called Paul Ditri as an expert witness in the field of "information technology and the analysis and discovery of content." In response to the prosecutor's questioning, Ditri agreed that his purpose "was to try to find any indication to infer that . . . defendant was on his computer as opposed to somewhere else in his home or medical office on November 25th[,] . . . 2006." Toward that end, Ditri reviewed data on the hard drives the prosecutor had seized from defendant's residence/office in December 2006. Through this forensic approach, Ditri tried to determine whether defendant created or altered any files on his laptop on the date of the alleged assault. He concluded that at 8:48 a.m., 3:44 p.m., and 4:07 p.m., someone had saved data in a strategy game called "Sid Meier's Alpha Centauri." Ditri further concluded that an undefined "action" occurred at 5:31 p.m. Ditri was unable to reach a definitive conclusion on the cause of this event. "It could have been a close. It could have been an auto save. It could have been another . . . save of a file that we

might not see here because it was played after this date, but there was some other action done at that time." According to Ditri, a final update occurred on the laptop at 6:43 p.m. Ditri opined that at the times indicated, someone had to be physically present in front of the laptop. He acknowledged that the events involved only the striking of a computer button. These events could not pinpoint defendant's whereabouts or activities at other times on Saturday, November 25, 2006.

II

Fresh-Complaint Evidence

Joanne woke up feeling groggy at approximately 11 a.m. on Sunday, November 26, 2006. She called Ana M., one of her closest friends and a person to whom she spoke every day. Ana M. was forty-five years old and had known Joanne for ten years when the trial began in 2012. She referred to Joanne as "her best friend." At Joanne's request, Ana agreed to go to breakfast. Joanne was quiet in the car, which, according to Ana, was unusual for her. Joanne testified she ordered her favorite dish, but did not eat any of it and felt "disturbed." When the prosecutor asked her to elaborate, Joanne stated: "I knew that something bad had happened the day before, and I think I was having a very difficult time coping with it."

Ana testified that after breakfast, she "kept asking [Joanne]

what was wrong . . . and [Joanne] started crying[.]" When asked if she remembered Joanne's "exact words," Ana stated: "That she believed she was raped." When the prosecutor asked Ana if Joanne identified her assailant, Ana responded: "Jimmy." Ana testified that she did not know who "Jimmy" was at the time. Ana also testified that Joanne did not describe the details of the alleged assault. When the prosecutor asked Ana why she did not ask Joanne "for details" of what defendant did to her, Ana simply responded: "I don't know." The conversation took place in the car and lasted about twenty minutes. Ana testified that she took Joanne home, stayed with her for a few hours, and suggested that she tell "a family member" about her allegations.

The State also called Cristina P., another of Joanne's close friends. Cristina testified that she called Joanne and left a voicemail on Saturday, November 25, 2006. Joanne returned Cristina's call late Saturday night; she told her "she went into the office, and Jimmy gave her a muscle relaxer because she had back pains again, and . . . she fell asleep." Cristina described Joanne's demeanor during the conversation as "very tired, sleepy, [and] groggy." When asked if Joanne said anything to her about the treatment she received from defendant, Cristina testified:

> She said she wasn't feeling right; she had a
> bad feeling. . . . I asked her, ["W]ere you
> alone with him[?"] . . . [S]he said, ["N]o,

26

my sister was there,["] and I said, ["O]kay.["] I didn't want to ask any more questions[.]

Q. When she said she had a bad feeling, was it your understanding that she was talking about . . . her back feeling badly or something else?

A. [I] [w]asn't sure. I didn't ask too many questions.

Q. But why did you ask . . . [if] her sister [was] there?

A. Because I wanted to know if she was alone with him.

Joanne did not recall speaking with Cristina on Saturday, November 25, 2006.

Joanne woke up feeling "distraught" at 1 a.m. on Monday, November 27, 2006. She no longer felt the effects of the medication. "I started to get visions, and everything started to become so much . . . clearer to me. I started to remember things." Unable to go back to sleep, Joanne woke Mark sometime between 5 and 6 a.m. and asked him to come to bed with her.[8] Joanne testified she was "very upset and crying a lot." At this time, she told Mark that she had been sexually assaulted.

Joanne testified that Mark became "visibly upset, but he was

---

[8] Joanne explained that Mark slept on the sofa "because he has bad sleeping habits."

a lot more calm than what [she] would have thought." He told her she needed to get help, and he advised her to contact the Rape Crisis Center in Westfield. Joanne told Mark that she did not call the police at that time because she "wanted to forget about it" and "didn't want to accept it."

Joanne telephoned the Rape Crisis Center and spoke to a counselor who convinced her to go to the hospital. At the counselor's request, Joanne brought her underwear. When she arrived at the hospital, Registered Nurse (RN) Thelma Keiser[9] conducted a sexual assault examination. By this time, however, Joanne had already showered and performed other bodily functions. Nurse Keiser was the first person to whom Joanne described the specific details of the alleged assault. The description of the assault Nurse Keiser read into the record from her report is consistent with Joanne's testimony.

Nurse Keiser testified that the physical gynecological examination she performed did not reveal any injuries or dried secretions.[10] Therefore, she did not find objective physical

---

[9] Nurse Keiser had been an RN since 1951, and was trained to conduct sexual assault examinations in 2003. According to her testimony, she had performed approximately thirty of these evaluations annually since 2003.

[10] As Nurse Keiser explained: "A dried secretion is evidence of body fluids shown up by what we call a black light, and if you see

evidence to corroborate Joanne's allegations of sexual assault. However, Nurse Keiser testified it is rare to find evidence of physical injury under these circumstances.

Mark testified that Joanne seemed "out of it" when she returned to the apartment on Saturday, November 25, 2006. Joanne informed Mark that she was previously unable to call because defendant had given her pain killers and a muscle relaxer, and she had been "trying to sleep it off." According to Mark, Joanne did not say anything to him about the alleged sexual assault the next day, Sunday, November 26, 2006. Rather, she revealed her allegations when they awoke at 7 a.m. on Monday, November 27, 2006. Mark and Joanne ended their romantic relationship in February 2007. He stated Joanne had never abused alcohol or taken illicit drugs while they were romantically involved, and to the best of his knowledge, she had never before accused anyone of sexual molestation.

The State also called Joanne's brother and father to provide fresh-complaint testimony. We will describe their testimony when we address the family's intervention.

---

that, you take a swab and dampen it and rub that area." In this context, bodily fluids can be semen, blood, and/or saliva.

III

A

Family Intervention

Joanne called her father after the hospital examination and told him she wanted to speak to her parents together. According to her father, "Marco," Joanne sounded upset on the phone; he detected a sense of urgency in her voice. Joanne met with her parents at a public park. In an effort to refresh his recollection, the prosecutor confronted Marco with two statements he had given eight years earlier.[11] The prosecutor asked Marco: "[H]ave you said in the past, back in December of '06, that [Joanne's] exact words were, 'Daddy, I was drugged, and I was raped?'" Marco responded: "Yes."

On the afternoon of November 27, 2006, Marco called Joseph and Jean to his home and told them of Joanne's allegations against defendant. Joanne told her family members that during the time defendant was sexually assaulting her, she heard the sounds of photographs being taken. When the prosecutor asked Joanne to elaborate on what was discussed during the family meeting, defense counsel immediately objected. The prosecutor ultimately withdrew

---

[11] Marco gave the first statement to defendant's attorney on December 21, 2006; he gave the second statement to a police detective on December 29, 2006.

A-3551-12T3

the question at the end of a sidebar conference with the court.

The prosecutor opted to establish the family's agreed-upon course of action by asking Joanne the following leading questions:

> Q. At the end of this meeting, was it understood that no one in your family was going to confront the defendant about your allegations?
>
> A. That is correct.
>
> Q. At the end of this meeting, was it decided that your father and your sister were going to try to get some answers regarding what happened on Saturday?
>
> A. That is correct.

Joanne was scheduled to work at defendant's medical office on Monday, November 27, 2006, but she "called in sick." Her sister Jean took the message. Joanne did not return to work thereafter and has not had any contact with defendant since Saturday, November 25, 2006. Assisted by her father and brother, Jean moved out of defendant's residence without his knowledge the following week. By December 2, 2006, Jean had moved out all of her belongings and had relocated to Joseph's house.

As agreed upon at the family meeting, Marco wanted to determine whether there was any physical evidence to corroborate Joanne's allegations against defendant. The prosecutor addressed this issue while eliciting Marco's direct testimony.

31

Q. [W]hat did you instruct [Jean] to do during that family meeting? What was your concern?

A. My concern [was] that if there [was] any proof of anything, I wanted to save it for the authorit[ies.] I wanted to grab whatever . . . possible to prove that there was or was not anything that had happened[.]

Q. So what was your instruction to [Jean]?

A. To get whatever [was] in that room in the part of the house where, according to [Joanne], it took place. I want[ed] the garbage. I want[ed] anything else that [was] in that room[.]

THE COURT: In which room?

. . . .

A. The treatment room. . . . Where [Joanne] was.

THE COURT: And you told her to get what in that room?

A. I wanted the garbage, the gar[b]age pail or anything that could be — that had been used in that room in that moment.

Q. Did you tell her to look for the camera?

A. Camera is one, yes.

Q. Did you tell her to look for the underwear or clothes, anything that —

A. That's correct.

Q. — that could shed light on the situation?

A. That's correct.

[(Emphasis added).]

32

Marco made clear that at the time, no family member suggested that Joanne report the incident to the police. Marco also instructed the family not to confront defendant with Joanne's allegations. When asked why he took this approach, Marco stated:

> A. Because I want[ed] to play safe. I want[ed] to see how things develop[ed].
>
> Q. Did you want time to conduct your own investigation?
>
> A. I wanted time. No, I want[ed] time for [Joanne] to come up with the truth.
>
> Q. Well, you've never said that before; is that right?
>
> A. No, I'm saying that right now.

At trial, Jean's parents continued to express reservations about the veracity of Joanne's allegations. Both parents testified that Joanne said she had "doubts" about what actually happened and believed defendant may not have penetrated her at all. The following exchange during cross-examination illustrates this point.

> Q. Would you agree with me that the reason that you wanted to have this investigation to determine if there was any truth to this was because [Joanne] was saying things that were confusing to you?
>
> A. Very much indeed.
>
> Q. And was saying things that you considered inconsistent?

33

A. Definitely.

Q. At any time after November 27th, [2006], did you ever hear [Joanne] say, either to you or in your presence, that there was no penetration in the events that occurred on November 25th[,] [2006]?

A. Yes, many times.

"Gail," Joanne's mother, testified as a witness for the defense. She corroborated her husband's testimony concerning the inconsistent nature of Joanne's allegations. In particular, Gail testified about a conversation she had with Joanne on Monday, November 27, 2006. Before we recite Gail's testimony, we note the record reflects that Gail became emotionally distraught when she first attempted to testify about Joanne's inconsistencies. Her emotional state prompted the trial judge to take a ten-minute recess to permit Gail to regain her composure. The prosecutor did not object nor request that the judge give the jury any curative instructions.

The following exchange occurred when the trial resumed.

Q. [Gail], you were at a point where you were telling us that you sat down in front of [Joanne].

A. Yes. My knees [were] touching her knees and I put my —

THE COURT: Louder, please.

A. I put my hand on her lap and I says to her [Joanne], can I ask you a few questions and she said yes. So I said did Jimmy touch your face[?] She said no. Did he put his penis in your mouth[?]. She said no. How about your chest? Did he touch you in your chest[?] No. How about your stomach? No. How about he put his penis in your stomach and rub it? No. I said how about down there in your first hole that he put his finger inside of you[?] No. How about his penis? Did he put it inside of you[?] She said no. How about hole in the back? Did he put his penis inside of you[?] No. How about his fingers? No. And I look at her and says [Joanne], he didn't do anything to you. He didn't put his penis inside of you in any way. He didn't touch you. That's not rape. She said no.

Nevertheless, neither Marco nor Gail informed the prosecutor or defense counsel about Joanne's alleged recantations, doubts, or inconsistencies. On redirect, Marco acknowledged he spoke with defendant's prior counsel for about an hour and a half on December 21, 2006, never mentioning that his daughter had expressed doubts about what defendant allegedly did to her. Marco also failed to mention Joanne's doubts in a statement he gave to law enforcement investigators on December 29, 2006.

On December 21, 2006, Gail gave a tape-recorded statement during a forty-five-minute interview with defense counsel. She also met with defense counsel in 2009, but she consistently refused to speak to law enforcement investigators. According to Gail, Joanne told her several times that she believed the incident may

have been a bad dream. However, when asked whether she thought Joanne believed in the truth of her own allegations, Gail responded: "Yes." Gail testified that she has ceased all contact with Joanne because Joanne would not drop the charges against defendant.

## B

### Items Collected by the Family

In the days following the family meeting, Marco took possession of certain items that proved to be a significant part of the State's case. First, Joanne gave Marco the bra she had been wearing on the day of the incident; this item was packaged in a paper bag. Then, acting on instructions he received from Jean, Joseph took possession of a towel and a pair of shorts, each packaged in separate Ziploc bags. Jean, who was residing at her brother's house at this time, removed these items from defendant's house without defendant's knowledge or consent. Joseph did not remember where the items were located in the house when he picked them up.

Marco testified that Jean gave him the towel and the pair of shorts, as well as a camera. Marco intended to keep the items exactly as Jean gave them to him. He believed the shorts were the ones Joanne had been wearing at the time of the incident; he was also aware Jean had already washed them by the time he took

possession.  Marco did not know where Jean found the towel.

Acting on Jean's direction, Joseph took the PalmPilot from defendant's office.  Marco testified that he and Jean took defendant's PalmPilot to a company called "Disk Doctors" in an effort to determine whether defendant used the device to take pictures of Joanne.  The State called Asim Qureshy, a Disk Doctors former employee.  Qureshy testified that Disk Doctors investigated defendant's PalmPilot in November 2006 and failed to uncover any photographs depicting nudity or sexual content.[12]

IV

Law Enforcement Investigation

Detective Judd Levenson of the Springfield Police Department was one of the lead law enforcement investigators assigned to the case.  In addition to taking Joanne's statement, Detective Levenson took statements from several of Joanne's friends and family members (excluding Gail and Jean).[13]  On December 14, 2006, Levenson

---

[12] It is undisputed that Disk Doctors "was unable to recover any data that corroborated Joanne's version of the events."  Mauti, supra, 208 N.J. at 527.

[13] In December 2006 and April 2007, Jean was compelled to testify before the grand jury that indicted defendant because she was not yet married to him.  Jean invoked the marital privilege under N.J.R.E. 501(2) on October 29, 2007, the day after she married defendant.  She thereafter successfully defended her right not to testify against her husband before this court, Mauti, supra, 416 N.J. Super. at 181, and the Supreme Court, supra, 208 N.J. at 523.

executed a search warrant of defendant's home and medical office to determine the presence of and possibly seize: (1) "cameras or any type of electronic device that could take a photo image, store a photo image, [or] view a photo image," (2) "narcotic substances that could cause a person to become unconscious, semi-conscious, or in any way immobilize a person," (3) medical records relating to Joanne, and (4) "any evidence related to a sexual assault." The law enforcement agents who executed the warrant were instructed to photograph all of the identified narcotics in the office and to "seize anything that was packaged in an unlabeled container or bottle or . . . anything found that was in a different person's name or prescribed by a different doctor."

At the time Levenson executed the search warrant, the police had not yet received the results of Joanne's physical evaluation showing the presence of chloral hydrate in her system. Levenson thus merely photographed all of the drugs on the premises, including a box of chloral hydrate cuplets he found in a cabinet in exam room three and a bottle containing chloral hydrate syrup. The search did not uncover any medical records documenting the treatments Joanne received in 2006.

At the time of their search, law enforcement investigators were also unaware that Marco and/or Jean were in possession of items they deemed relevant to this case. On December 21, 2006,

one week after the search of defendant's property, Jean and Marco voluntarily turned over the PalmPilot and its memory card, but withheld the shorts, the towel, and the bra. On December 22, 2006, Levenson obtained and executed a warrant to search Marco's home. While the investigators were executing the search warrant, Marco produced a tool box containing a bra wrapped in a paper bag and two gallon-sized Ziploc bags containing the shorts and the towel.

Although the bag containing the towel was unopened, Levenson noticed an "off-white colored type of staining." Levenson testified he noticed "the same color and the same type of terrycloth towels" in a drawer of a nightstand in the master bedroom of defendant's residence. Defendant testified "it was just our practice that when [Jean] was having her period we would not have intercourse but we would still be intimate[.]" According to defendant, the towel seized during the search would have had his semen on it as a result of this practice.

The police did not find any "terrycloth towels or any types of towels that could be laundered in a washing machine" in the medical side of the building. All of the towels on the medical side of the building "were either regular rolls of white paper towels or some type of . . . flimsy cloth material that you can just use and throw away." Tests later confirmed that defendant's

semen was on the towel.  However, there was no evidence of female DNA on the towel.

## Stipulations

In early March 2007, the Union County Prosecutor's Office received a toxicology report showing that Joanne's November 27, 2006 urine sample tested positive for Ephedrine and Phenetol (Tramadol).  The report was prepared by the New Jersey State Police Laboratory, Analytical Biochemistry Laboratory, Inc., and the Federal Bureau of Investigations (FBI) Laboratory for Forensic Examinations.  The State and defendant stipulated before the jury that the New Jersey State Police did not screen Joanne's urine sample for the presence of chloral hydrate.  Defense counsel also stipulated to the authenticity and accuracy of the sexual assault evaluation.

The State and defendant further stipulated before the jury that on August 14, 2007, Analytical Biochemistry, Inc. screened Joanne's urine sample for the presence of zolpidem (Ambien) and chloral hydrate.  The sample tested negative for zolpidem metabolics and positive for chloral hydrate metabolics.  The parties stipulated that no substance other than chloral hydrate can break down into chloral hydrate metabolics.

The State and defendant further stipulated that on January 29, 2009, the FBI screened Joanne's urine sample and found it

positive for the presence of chloral hydrate metabolics. In the interest of completeness, we note that defendant also stipulated to the authenticity and accuracy of the State Police's evaluations concerning the bra, towel, and shorts seized on December 22, 2006. No petroleum-based products were found on these items. Defendant's semen was found on the towel.

V

Against this record, defendant now raises the following arguments.

POINT I

INTRODUCTION OF THE TESTIMONY ABOUT THE TOWEL AND ITS DNA EVIDENCE WAS ERROR BECAUSE IT VIOLATED THE CONFRONTATION CLAUSE; WAS INADMISSIBLE HEARSAY; LACKED ANY FOUNDATION; AND ANY PROBATIVE VALUE WAS FAR OUTWEIGHED BY THE UNFAIR PREJUDICE.

A.   The Nature of the Evidence.

B.   The Prosecution Used the Towel To Corroborate [Joanne's] Allegations.

C.   The Trial Court's Erroneous Ruling.

D.   Mauti's Constitutional Right to Confront [Jean's] Incriminating Statement Was Violated.

E.   The Testimony of [Marco] and [Joseph] Regarding [Jean] Bringing the Towel to Her Father Was Inadmissible Assertive Conduct Hearsay.

F.   Beyond the Confrontation and Hearsay Issues, It Was Error to Admit the Towel Because It Lacked Foundation and Was Not Relevant.

G.   The Admission of the DNA Evidence Compounded the Prejudice.

POINT II

IT WAS ERROR TO PERMIT THE INTRODUCTION OF HEARSAY EVIDENCE UNDER THE FRESH COMPLAINT DOCTRINE.

POINT III

IT WAS ERROR TO PERMIT THE INTRODUCTION OF ADDITIONAL HEARSAY EVIDENCE AND EXHIBITS (WITHOUT OBJECTION) THAT BOLSTERED THE CREDIBILITY OF THE COMPLAINANT.

POINT IV

IN A CASE OF FIRST IMPRESSION, THE TRIAL COURT ERRONEOUSLY ADMITTED A LETTER SUBMITTED TO THE STATE BY HIS COUNSEL AS MAUTI'S STATEMENT.

A.   The Letter and The State's Use of It.

B.   The Judge's Ruling.

C.   The Letter is Barred by N.J.R.E. 410.

D.   The Letter Should Have Been Barred by N.J.R.E. 403.

POINT V

IT WAS ERROR TO ADMIT EVIDENCE OF UNRELATED ALLEGED INCIDENTS OF SEXUAL INTEREST.

a. The Laser Treatment Interaction.

42                                    A-3551-12T3

b.    The Peeping Allegations.

c.    Overwhelming Prejudice.

We begin our analysis by determining the admissibility of the towel containing defendant's semen.  This court reviews "the trial court's evidentiary rulings for abuse of discretion."  State v. Gorthy, 226 N.J. 516, 539 (2016).  Thus, "trial courts are granted broad discretion in making decisions regarding evidentiary matters, such as whether a piece of evidence is relevant . . . and whether a particular hearsay statement is admissible under an appropriate exception[.]"  State v. Scharf, 225 N.J. 547, 572 (2016) (citations omitted).  We will reverse an evidentiary ruling only if it "was so wide off the mark that a manifest denial of justice resulted."  Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (citations omitted).

After reviewing the extensive record developed before the trial court on this issue, we are satisfied the court abused its discretion in admitting the towel.  The court's decision denied defendant's right to a fair trial and resulted in a manifest denial of justice.  See State v. Perry, 225 N.J. 222, 235 (2016) (explaining that the right to a fair trial encompasses a criminal defendant's right to confront the witnesses against him).

43                                                    A-3551-12T3

NONVERBAL CONDUCT HEARSAY

Among the items Jean retrieved in response to her father's nebulous request "to grab whatever . . . possible to prove that . . . anything . . . had happened" was a towel stained with defendant's semen. The trial judge made the following findings in support of his decision to deny defendant's motion to exclude the towel:

> [Jean] lived in the house on a regular basis[;] she was the office manager who was in the office on a regular basis[;] and she was engaged to the defendant and living with him as a significant other at that point in time.
>
> It's a fair inference that she knows what's in the house, [and] what the various towels, linens and other things in the house . . . [are] . . . used for. It's also a fair inference that she knew what was in the office, [and] how the office was run[.] And I think it's also a fair inference that she knew about the sexual relations between her and the defendant.
>
> Based on those . . . fair inferences, and in response to what [Marco] asked her to bring, she . . . brought him this towel[.]

Under these circumstances, defendant argues: (1) Jean's behavior was nonverbal conduct under N.J.R.E. 801(a)(2); (2) the towel was irrelevant under N.J.R.E. 401 because it was not linked to any specific aspect of the alleged sexual assault; and (3) the DNA evidence found on the towel should have been excluded under

N.J.R.E. 403 because its prejudicial nature far outweighed its probative value. The State argues the record supports the trial court's findings and subsequent legal decision to admit the towel into evidence. We conclude the towel should have been excluded because it constituted inadmissible hearsay and was not relevant to any disputed factual issue.

N.J.R.E. 801(c) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (Emphasis added). N.J.R.E. 801(a) defines a statement as "(1) an oral or written assertion or (2) nonverbal conduct of a person if the person intends it as an assertion." (Emphasis added). Our Supreme Court held that a physician engaged in "nonverbal conduct," as that term is used in N.J.R.E. 801(a)(2), when the physician altered a patient's medical records to conceal malfeasance:

> The alteration of [the plaintiff's] medical records constituted a verbal act . . . by [the defendant] tantamount to a statement that was evidential against him under the rule.[14] That is "no more than an application of the general proposition that the behavior of a litigant with respect to relevant evidence may permit an inference that his behavior was prompted by a conscious appreciation that the evidence would or might be hurtful to . . . his

---

[14] The Court was referring to N.J.R.E. 803(b), which provides "a statement made by a party opponent may be offered against him or her in evidence." Rosenblit, supra, 166 N.J. at 409 (citing N.J.R.E. 803(b)).

> position." . . . A jury could infer from [the defendant's] behavior that he believed that [the plaintiff's] medical records would prejudice his position in the litigation. That belief could be significant to a jury faced with expert evidence in equipoise.
>
> [Rosenblit v. Zimmerman, 166 N.J. 391, 409 (2001) (citations omitted).]

Here, Jean's nonverbal conduct should have been excluded as inadmissible hearsay under N.J.R.E. 802(a)(2). The trial judge's findings illustrate the prejudice associated with admitting a non-testifying witness's nonverbal conduct. The judge found the jury was free to infer the towel had a direct evidential connection to Joanne's allegations, based only upon Jean's familiarity with defendant's personal and professional conduct. The jury was also free to infer that Jean selected the towel to forge a connection between the DNA evidence contained therein and the charges in this case, despite the absence of any evidence supporting such a connection. Without Jean's testimony to provide a proper evidential context, the admission of her nonverbal conduct permitted the jury to speculate about her motives and criteria for selection of the towel, thereby imbuing the towel with a probative value wholly unsupported by competent evidence.

The Confrontation Clause of the Federal and State Constitutions guarantee defendant's right to confront the witnesses against him. U.S. Const. amend. VI; N.J. Const. art. I,

¶ 10. "The right of confrontation 'bars admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross examination.'" State v. Gibson, 219 N.J. 227, 240 (2014) (quoting Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 224, 236 (2006)). Because Jean's nonverbal conduct constituted testimonial evidence, the trial court violated defendant's right under the Confrontation Clause by admitting this evidence. State v. Basil, 202 N.J. 570, 591 (2010) (citing Crawford v. Washington, 541 U.S. 36, 50—53, 68, 124 S. Ct. 1354, 1363—65, 1374, 158 L. Ed. 2d 177, 192—94, 203 (2004)).

The prosecutor's decision to emphasize Jean's nonverbal conduct as a key part of the State's case significantly exacerbated the prejudice this hearsay evidence caused, thus undermining defendant's right to a fair trial. The following remarks from the prosecutor's summation illustrate this point:

> If [Jean] thought there was absolutely no possibility that this defendant could commit these crimes[,] she wouldn't be running around putting shorts, . . . semen-stained towels, and PalmPilots in Ziploc bags and moving [every one] of her belongings out of his house.
>
> . . . .
>
> There was DNA evidence involved in this case and the towel was it.

. . . .

>    What we . . . know is that [defendant's] semen
>    is on this towel and we know that this is the
>    type of towel that he uses when he's looking
>    to ejaculate or clean up after sex.

>    We know this towel is available to him in his
>    bedroom located right next to his office[.]

>    . . . .

>    It makes no sense[.]  . . . [I]f [Jean] was
>    involved in any way with the defendant's semen
>    getting on the towel[,] there would be no need
>    for her to take it.  She would know it ha[d]
>    nothing to do with the sexual assault.

>    So now we consider, well, maybe she was taking
>    it as a DNA sample.  Really?  It makes no
>    sense that [Jean] took this towel for a DNA
>    sample.  If you believe that, then you also
>    have to believe that in the midst of being
>    convinced that this defendant raped her
>    sister[,] she engaged in a sexual act with
>    him.[15]

>    She couldn't wait to get herself out of that
>    house and far away.  I suggest to you that the
>    furthest thing from her mind was wanting to
>    engage in any type of intimate act with the
>    defendant[.] [P]lus isn't it common knowledge

---

[15] The prosecutor's exhortation to the jury also undermined the public policy underpinning the spousal privilege codified in N.J.R.E. 501(2).  Jean has a right not to be compelled to testify as a witness against her spouse.  This rule of evidence is intended to protect the institution of marriage as a matter of public policy.  As our Supreme Court noted in Mauti I, "the spousal privilege is intended to protect the sanctity and tranquility of marriage from the negative consequences which are 'presumed to attend the compelled condemnation of one spouse by another in a criminal proceeding.'"  Mauti, supra, 208 N.J. at 534 (quoting State v. Baluch, 341 N.J. Super. 141, 171 (App. Div.), certif. denied, 170 N.J. 89 (2001)).

that if you need a DNA sample, [you] grab a toothbrush, . . . a razor, [or] . . . a hairbrush?

The prosecutor improperly urged the jury to speculate on Jean's state of mind and to infer a sinister purpose from her nonverbal conduct, thereby exploiting defendant's inability to refute the implications attributable to a non-testifying witness. This approach took full advantage of the inherent prejudice associated with hearsay evidence. Defense counsel also argued the prosecutor exceeded the scope of the trial court's original ruling when she stated that Jean's decision to take the towel, shorts, and PalmPilot suggested "a state of mind that [Jean] had about whether or not there was an opportunity to commit this sexual assault."[16] The trial judge agreed and gave the jury the following cautionary instruction:

> [T]here has been a comment by the prosecutor that from the evidence you may infer that [Jean's] actions caused her to believe that there was a window of opportunity to commit the offense.
>
> I hereby instruct you that you may not consider such an inference as to whether [Jean] believed there was a window of opportunity or not to commit the crime.

---

[16] We make clear defense counsel preserved for the record all of his earlier objections to the admissibility of this evidence.

This curative instruction was insufficient to counteract the prejudice caused by the admission of this hearsay evidence.

Defendant also argues the towel should have been excluded because it was not relevant to any disputed issue. We agree. N.J.R.E. 401 defines relevant evidence as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." The Supreme Court has made clear that "the primary focus in determining the relevance of evidence is whether there is a 'logical connection between the proffered evidence and a fact in issue.'" State v. Willis, 225 N.J. 85, 98 (2016) (quoting State v. Covell, 157 N.J. 554, 565 (1999)).

Here, the State failed to present any evidence linking the towel to the sexual assault described by Joanne. None of the witnesses who testified for the State had personal knowledge about how defendant's semen came to be on the towel; nor did they explain how the towel was connected to the sexual assault. Joanne's testimony did not mention defendant ejaculating or using a towel to wipe or contain his semen. Indeed, the prosecutor conceded this point in her summation to the jury.

We hold that the trial court erred in admitting the towel into evidence because Jean's retrieval of the towel in response to her father's request constituted nonverbal testimonial hearsay.

The admission of this hearsay evidence violated defendant's right to a fair trial. Gibson, supra, 219 N.J. at 241–42. Accepting the veracity of Joanne's testimony arguendo, we also hold the DNA evidence contained in the towel was not relevant and thus should have been excluded under N.J.R.E. 401. In light of these legal conclusions, defendant's argument concerning N.J.R.E. 403 is moot.

### FRESH-COMPLAINT DOCTRINE

We next consider defendant's argument concerning the misuse of fresh-complaint testimony. Justice Garabaldi, the first woman to sit as an Associate Justice on the New Jersey Supreme Court, explained the evolution of the fresh-complaint doctrine in State v. Hill, 121 N.J. 150 (1990). Writing for a unanimous Court, Justice Garabaldi stated:

> The fresh-complaint doctrine evolved as a response to the common-law requirement of "hue and cry." Victims of violent crimes were expected to cry out immediately and alert their neighbors that they had been violently assaulted. The neighbors could then initiate a collective search for the aggressor. The "hue and cry" also served to dispel any suspicion that the victim had been somehow involved or complicit in the crime[.]
>
> [Id. at 157.]

Justice Garabaldi conducted a thorough, scholarly review of the doctrine's sexist origins, which perpetuated the myth that a woman who has been sexually assaulted will "naturally" report the

incident in a timely fashion; and for those who failed to do so, "the only rational explanation was that she had not really been raped." Id. at 160. Justice Garabaldi noted that by the time Hill was decided in 1990, these legally misguided, morally offensive notions of a woman's typical reaction to sexual violence had been mostly discredited. Id. at 162. Those courts and commentators who continue to adhere to the fresh-complaint doctrine "often based their continued adherence to the rule on intuitive, pseudo-Freudian analysis of the ways a 'normal' woman would react to sex and to rape." Ibid.

Despite these misgivings, the Court in Hill ultimately "conclude[d] that women victims are better served by the continuance of the fresh-complaint doctrine than by its elimination. The present rule as designed neutralizes jurors' negative inferences concerning the woman's silence after having been raped." Id. at 170. However, the Court expressly warned against extracting an accusation from an alleged victim of sexual assault through coercion. Ibid. The Court thus charged the trial court with the responsibility "to examine all the circumstances of the questioning to determine whether the line between coercive and benign questioning has been crossed." Ibid.

In Hill, the Court also empowered the trial court with the discretion to determine when fresh-complaint testimony should be

excluded as duplicative:

> We have traditionally left it in the hands of the trial court to decide whether to limit or exclude witnesses. <u>See</u> <u>State v. Mucci</u>, 25 <u>N.J.</u> 423, 433 (1957) ("The question of limiting witnesses calls for the exercise of sound discretion in the context of the circumstances of the particular case. There can be no doubt as to the power of the trial judge to restrict the number of witnesses[.]"). It would usurp the trial court's discretion to establish a blanket policy restricting testimony that fully qualifies for admissibility under the fresh-complaint rule but is duplicative or prejudicial.
>
> . . . .
>
> There may be instances in which the trial court may find no prejudice from duplicative fresh-complaint testimony. That may occur when the victim complained at various times to different people, or when so much other evidence exists that duplicative testimony is unlikely to tip the scales. Yet, in close cases in which the victim's complaint has already been once established and it appears that repeated fresh-complaint testimony would leave the jury with the impression that the State has gathered a greater number of witnesses than the defense, the trial court may properly exercise its discretion and exclude the testimony.
>
> [<u>Id.</u> at 169—70.]

As our Supreme Court recently reaffirmed and explained, the fresh-complaint doctrine:

> allows the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the

A-3551-12T3

inference that the victim's initial silence or delay indicates that the charge is fabricated. . . . In order to qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support.

. . . .

Only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted; the fresh-complaint testimony is not to be used "to corroborate the victim's allegations concerning the crime."

[R.K., supra, 220 N.J. at 455—56 (citations omitted).]

Defendant argues the trial judge erred in allowing the State to present fresh-complaint testimony from five witnesses, to wit, Marco, Joseph, Ana M., Cristina P., and Mark. Defendant argues the fresh-complaint testimony of these five witnesses was impermissibly cumulative and improperly bolstered Joanne's credibility. Defendant emphasizes that he never challenged Joanne's credibility based on her failure to report the alleged sexual assault in a timely manner. His defense was predicated on the effects the medication had on Joanne's perception and recollection of what occurred on November 25, 2006.

At the charge conference conducted pursuant to Rule 1:8-7(b), the trial judge decided, sua sponte, not to give the jury any

54

instructions on fresh-complaint testimony.  The judge provided the

following explanation in support of his ruling:

> [W]hile there were some witnesses in this case
> that you could characterize as fresh[-]
> complaint witness[es][,] my inclination is
> that the fresh[-]complaint charge should not
> be given here for the following reasons.
> Usually[,] a fresh[-]complaint witness is
> someone whose testimony would not be
> admissible otherwise and is only being
> admitted . . . to rebut the inference that the
> jury might make that someone who was sexually
> assaulted wouldn't disclose to someone who's
> close to them in a reasonable period of time.
>
> Now, in this case, there [were] a number of
> early disclosures [such as to a] friend, [to
> a] boyfriend, [or to] family members, and the
> jury has heard all that.  But that evidence
> is also relevant to a whole lot of other
> things, like motive, memory, quality of
> memory, prior consistent [statements][,] or
> [prior] inconsistent statements.  And . . .
> that evidence was coming in anyway, even if
> there was no fresh[-] complaint doctrine.
>
> . . . .
>
> PROSECUTOR: I agree with your assessment, Your
> Honor.  We . . . have no objections to taking
> that out.
>
> DEFENSE COUNSEL: Originally our objection to
> the offer that fresh[-]complaint testimony
> should come in was that the rule only allows
> for it to negate the inference that the
> [complaining witness] failed to report it.
>
> . . . .
>
> [W]e said that there was no need for  fresh[-
> ]complaint witnesses because we felt that the
> . . . defense would never assert that she

A-3551-12T3

> failed to promptly report to people that she
> would be expected to report to. So I don't
> think anything has changed. Our feeling from
> the beginning was that this is a not a fresh[-
> ]complaint issue.
>
> . . . .
>
> THE COURT: Do you think the fresh[-]complaint
> charge [should be] given?
>
> DEFENSE COUNSEL: . . . [W]e do not need it in
> this case at this point.

In its letter-brief, the State contends, without citation to the record,[17] that "defense counsel withdrew his objections to the admission of the [f]resh[-][c]omplaint testimony." Consequently, even if we were to conclude that the admission of the testimony was error, such error cannot serve as a basis for reversal on appeal. The State relies on the invited-error doctrine, which is "intended to 'prevent defendants from manipulating the system' and will apply 'when a defendant in some way has led the court into error' while pursuing a tactical advantage that does not work as planned." State v. Williams, 219 N.J. 89, 100 (2014) (quoting State v. A.R., 213 N.J. 542, 561-62 (2013), cert. denied, sub nom. Williams v. New Jersey, ____ U.S. ____, 135 S. Ct. 1537, 191 L. Ed. 2d 565 (2015)).

---

[17] It is the parties' "responsibility to refer us to specific parts of the record to support their argument." Spinks v. Township of Clinton, 402 N.J. Super. 465, 474 (App. Div. 2008), certif. denied, 197 N.J. 476 (2009).

The State's characterization of defendant's position with respect to the admissibility of fresh-complaint testimony is not supported by the record. To the contrary, defense counsel strenuously advocated against the admission of fresh-complaint testimony in pre-trial motions. Thus, defense counsel's legal position at the charge conference remained analytically consistent. We conclude the trial judge abused his discretionary authority when he permitted five witnesses to provide fresh-complaint testimony. The cumulative effect of these witnesses' testimony improperly bolstered Joanne's credibility. The trial judge's failure to instruct the jury on how to consider this fresh-complaint testimony significantly exacerbated the prejudice caused by this threshold error.

We first address defense counsel's position at the charge conference. The State argues defense counsel's acquiescence to the judge's decision not to instruct the jury on fresh-complaint testimony during the charge conference precludes defendant from raising this issue on appeal under the invited error doctrine. The State's position is inconsistent with the Supreme Court's holding in State v. Jenkins, 178 N.J. 347 (2004).

In Jenkins, the defendant was tried before a jury on the charge of murder and related offenses. Id. at 355—56. At the charge conference, the defense counsel argued to the trial court

"against instructing the jury on lesser-included offenses pertaining to homicide, preferring to gamble with an all-or-nothing approach on the murder charge." Id. at 356. The jury found the defendant guilty of murder. Id. at 357. Among the issues raised on direct appeal to this court, the defendant "reversed positions" and "notwithstanding his request at trial," argued the trial court "erred in failing to instruct [the jury] on lesser-included offenses of reckless manslaughter and aggravated manslaughter." Ibid. We agreed and vacated the defendant's convictions. Ibid. (citing State v. Jenkins, 356 N.J. Super. 413, 431 (App. Div. 2003)).

On appeal to the Supreme Court, the State argued "that the doctrine of invited error precludes a defendant from taking a position at trial and then, after embracing that approach to his ultimate disadvantage, changing course on appeal and alleging error." Id. at 358. The Court framed the legal question as follows: "We first must determine if the error was, in fact, 'invited.' Specifically, we focus on whether a defendant invites error merely by advocating an erroneous approach or, instead, whether the court actually must rely on the defendant's position in reaching a result." Ibid.

The Court began its analysis by noting that, historically, the doctrine of invited error has been used in cases in which a

defendant has beseeched the trial court to adopt a particular legal position and then repudiates that same position when the outcome of the trial was unfavorable. Ibid. (citations omitted). "Thus, when a defendant asks the court to take his proffered approach and the court does so, we have held that relief will not be forthcoming on a claim of error by that defendant." Ibid. Up to that point, the Jenkins Court noted it had characterized the doctrine of invited error "as error that defense counsel has 'induced.'" Id. at 359 (quoting State v. Corsaro, 107 N.J. 339, 346 (1987)). "However, we have not decided whether actual reliance by the court is necessary to trigger the doctrine." Ibid. (emphasis added).

After reviewing the similarities between the doctrine of invited error and its civil law analog, the doctrine of judicial estoppel, the Jenkins Court reached the following conclusion:

> The evil to be avoided is untoward control of the system, leading to inconsistent results. Central to that concern is the principle that a litigant should not be allowed to mislead courts by having one tribunal rely on his or her initial position while a subsequent body is led in a different direction. Thus, it follows that "[t]o be estopped a party must have convinced the court to accept its position in the earlier litigation." Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606-07 (App. Div. 2000).
>
> The criminal analog of invited error also is designed to prevent defendants from

manipulating the system.  Therefore, the
invited-error doctrine, like its civil-law
counterpart, is implicated only when a
defendant in some way has led the court into
error.  Conversely, when there is no evidence
that the court in any way relied on a
defendant's position, it cannot be said that
a defendant has manipulated the system.  Some
measure of reliance by the court is necessary
for the invited-error doctrine to come into
play.

[Jenkins, supra, 178 N.J. at 359 (emphasis
added).]

Applying these principles to the salient facts in Jenkins,
the Court affirmed our decision to reverse the defendant's
conviction based on the trial court's failure to instruct the jury
to consider lesser-included offenses of the charge of murder.  Id.
at 364.  The Supreme Court quoted the trial judge's analysis in
Jenkins to show that despite the pleas from the prosecutor
reminding the court it had an "independent duty to make that
determination irrespective of [the] defendant's position, the
court agreed with [the] defendant."  Id. at 360.  Thus, the
Supreme Court concluded that the trial court's comments made clear:

that the court arrived at the decision not to
instruct on lesser-included offenses
independently of any invitation or
encouragement by defendant.  As such, the
doctrine of invited error does not apply.
However, because defendant did not object to
the lack of such an instruction, we will
review the decision not to instruct on lesser-
included offenses under a plain-error
standard.

[Ibid. (emphasis added).]

Returning to the facts of this case, the record here is clear that defense counsel did not request the trial judge not to instruct the jury on how to consider fresh-complaint testimony. The trial judge made this decision sua sponte.[18] Furthermore, unlike the position adopted by the prosecutor in Jenkins, here the prosecutor equally acquiesced to the trial judge's decision. In this light, even applying a plain error standard of review under Rule 2:10-2, we are satisfied the trial court's failure to instruct the jury on how to consider this evidence had the capacity to lead to an unjust result.

Once a trial court decides to admit fresh-complaint testimony, it must instruct the jury on how to consider this evidence. The trial court's failure to charge the jury on fresh-complaint testimony is sufficient to raise a reasonable doubt as to the reliability of the verdict. Jenkins, supra, 178 N.J. at 361. Thus, even if we were to conclude that the trial judge did not abuse his discretionary authority in allowing five witnesses to provide fresh-complaint testimony, the court's failure to

---

[18] Although not raised by the parties, we are compelled to note that the trial judge decided, sua sponte, to reverse his pretrial ruling concerning the nature of this testimony in the course of conducting the charge conference required by Rule 1:8-7(b).

instruct the jury on how to consider this evidence constituted an independent basis to reverse defendant's conviction.

Analysis of this issue is grounded in State v. Bethune, 121 N.J. 137 (1990), which was also authored by Justice Garabaldi and released simultaneously with Hill. The analytical framework established by Justice Garabaldi in Bethune was reaffirmed by the Court in R.K.:

> Only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted; the fresh-complaint testimony is not to be used "to corroborate the victim's allegations concerning the crime." [Bethune, supra, 121 N.J.] at 146; see also State v. W.B., 205 N.J. 588, 617 (2011) ("A witness may testify only to the general nature of the complaint, and unnecessary details of what happened should not be repeated."). Therefore, the trial court is required to charge the jury that fresh-complaint testimony is not to be considered as substantive evidence of guilt, or as bolstering the credibility of the victim; it may only be considered for the limited purpose of confirming that a complaint was made. Bethune, supra, 121 N.J. at 147-48; State v. P.H., 178 N.J. 378, 393 (2004) (asserting that Bethune "required" courts to give limiting instruction).
>
> [R.K., supra, 220 N.J. at 456 (emphasis added).]

The model jury charge on fresh-complaint testimony the Supreme Court approved on February 5, 2007, scrupulously adheres to Bethune's holding:

> A fresh-complaint is not evidence that the sexual offense actually occurred, or that _____(name)_____ is credible. It merely serves to negate any inference that because of (his/her) assumed silence, the offense did not occur. It does not strengthen (his/her) credibility. It does not prove the underlying truth of the sexual offense. A fresh-complaint only dispels any negative inference that might be made from (his/her) assumed silence.[19]

On November 18, 2009, the trial judge conducted an N.J.R.E. 104 evidentiary hearing to determine the admissibility of fresh-complaint testimony from three witnesses the State planned to call at trial: Joanne's best friend Ana, her former boyfriend Mark, and her father Marco. At the conclusion of the testimonial part of the hearing, the prosecutor argued "this evidence is admissible to . . . negate any inference that the victim remained silent[,] [a]nd to show the jury that she . . . complained to who[m] you would expect her to complain[.]"

The prosecutor argued the record developed at the N.J.R.E. 104 hearing satisfied the three principal issues the Supreme Court identified in Hill: (1) the testimony was not obtained through coercive measures; (2) the witnesses were Joanne's confidants; and (3) Joanne came forward and shared her experience with these three

---

[19] Model Jury Charges (Criminal), Fresh Complaint (Feb. 2007), http://www.judiciary.state.nj.us/criminal/charges/non2c011.pdf.

witnesses in a timely fashion.  Finally, the prosecutor noted it was within the trial court's discretion to determine whether the testimony was unduly duplicative.

In opposing the State's application, defense counsel emphasized that "the cumulative effect [results] in some level of corroboration."  However, defense counsel expected the prejudice would be mitigated by the court's instructions to the jury on how to properly consider this testimony.  Defense counsel nevertheless asked the court to exercise its discretion and reduce the number of witnesses who would testify in this capacity.  The court rejected defendant's application to reduce the number of witnesses and ruled that Ana, Mark, and Marco would be allowed to testify under the fresh-complaint doctrine at trial.  Without elaboration, the judge stated that he did not find these three witnesses to be "cumulative or inappropriate" under Hill.

Under these circumstances, we conclude the trial judge abused his discretion when he permitted the State to call five fresh-complaint witnesses at trial.  These five witnesses described Joanne's demeanor at the time she disclosed the incident.  They were all questioned by the prosecutor in a manner that required them to elaborate on the steps they took to assist Joanne in dealing with this traumatic situation.  The cumulative effect of these factors had the capacity to influence the jury's assessment

64

of Joanne's credibility.  The judge's failure to provide the jury with clear instructions on the how to consider this evidence not only exacerbated this prejudice, but constituted an independent basis for finding reversible error.

<u>LETTER FROM DEFENSE COUNSEL</u>

On May 14, 2007, the attorney who represented defendant before the trial court sent a letter to one of the Assistant Prosecutors[20] who tried the case.  In the prefatory part of the letter, defense counsel stated:

> As you know, this firm represents Dr. James Mauti with respect to your investigation into allegations made by [Joanne].  You have asked that I provide you with information concerning the medications which were given to [Joanne] in the course of her treatment by Dr. Mauti. <u>In this correspondence I will specifically identify the medications and dosages that were administered and will also provide you with information which should be considered by your office in evaluating the allegations made and what action against my client you may be considering</u>.
>
> Let me first say that I understand your duty to protect the public and to prosecute wrongdoing where found.  I also understand that it is important to give consideration to the allegations of an alleged victim and to conduct such investigation as is necessary to

---

[20] The Assistant Prosecutor named in this letter was one of two prosecutors who represented the State at trial.  We infer she was the lead prosecutor because she gave the opening statement, presented the testimony of the complaining witness, represented the State at the charge conference, and delivered the summation to the jury.

evaluate the claims of wrongdoing that are brought to your attention. However, you have indicated to me that you may very well proceed to charge my client with criminal offenses without first seeking an indictment. I ask that you consider the impact of that action before settling on that course of action.

Dr. Mauti is a licensed medical doctor whose reputation in the community and whose license to practice medicine will be materially affected by any public charge that you bring against him, particularly one which is unsubstantiated and uncorroborated. Consequently, since allegations of wrongdoing against him are untrue, I ask that before you proceed to present any charges that you consider the background information provided in the following sections. The facts and opinions which I will detail herein provide important, exculpatory information that, pursuant to State v. Hogan, 144 N.J. 216 (1996), must be presented to the grand jury before you consider any bringing [sic] charges against Dr. Mauti.

[(Emphasis added).]

From this point forward, the letter is divided into four numbered sections, each describing the topic or issue addressed therein. Section 1 is entitled "[Joanne's] Recent Treatment History;" Section 2 is entitled "The Known Side-Effects of the Medications [Joanne] Received;" Section 3 is denoted with the name of Joanne's older brother, whom we have identified here as Joseph; and Section 4 is entitled "The Medicines Seized Pursuant to the Search Warrant." In support of the topic denoted under Section 2, defense counsel offered the opinion of a physician, as well as

that of an alleged toxicology expert.  Both of these individuals are credentialed in New York State.  Counsel attached copies of reports authored by these individuals.[21]  Counsel urged the Assistant Prosecutor to consider the contents of the two expert reports, as well as the relevant comments and warnings included in the Physician's Desk Reference, and argued that "distorted perceptions of reality are a potential effect of such drugs in certain patients."

Defense counsel's description of "the medications and dosages" defendant administered to Joanne is at the heart of one of the critical issues raised in this appeal.  In the interest of clarity, we will recite the relevant parts of this Section of the letter verbatim.

> Section 1 [Joanne's] Recent Treatment History.
>
> [Joanne] was seen as a patient on November 21, 2006.  She was seen for complaints of lower back pain subsequent to excessive heavy housework.  [Joanne] reported with no significant past medical history and no known allergies to medications. After obtaining her medical history, Dr. Mauti examined her lower back, which included a neurological examination, muscle strength testing, range of motion, and straight leg testing.  Dr. Mauti concluded she was suffering from lower back strain and spasms.  During the office visit, [Joanne] also complained of signs and symptoms consistent with rhinitis/sinusitis. Dr. Mauti treated her back condition with osteopathic

---

[21] Neither one of these experts testified at trial.

manipulation of the lower back and by ordering Tizanidine (4 mg. by mouth, twice per day), Ultracet (37 5/325 mg. by mouth, one or two as needed for pain), Prednisone (40 mg. by mouth for three days, then gradually decreased to 30 mg., 20 mg., and 10 mg.), and Tussafed HCG syrup (liquid) (10 ml. as needed).

The next treatment event occurred on Thanksgiving Day, Thursday, November 23, 2006. Counsel stated Joanne came to defendant "complaining of undiminished back pain and continued rhinitis/sinusitis." Defendant "treated her with a continuation of her medicines and a TENS application (a portable electronic stimulation device intended to relieve the spasm by exhausting the muscle[)]. . . . Treatment for her rhinitis/sinusitis consisted of her continued use of Tussafed HCG, as needed." Defendant also gave her a TENS unit "for home use."

Counsel stated that defendant next treated Joanne on November 24, 2006. Her physical complaints were the same: back pain and rhinitis/sinusitis. Counsel stated defendant provided the same treatment he had "ordered on November 21, 2006[.]"

According to counsel,

> [Joanne] was next seen on November 25, 2006. On that day, she complained of continued but severe back pain and spasms. She described her pain level as 10 out of 10 with pain in the left lower back, radiating to left buttocks and left leg. She continued to complain of rhinitis/sinusitis. On that date, [Joanne] received Tizanidine (4 mg. by mouth), Ultracet (37.5/325 mg. by mouth), Prednisone

A-3551-12T3

(20 mg. by mouth), and Tussafed HCG syrup
(liquid) (approximately 10 ml.).  Next, hot
wet heat packs were applied every 20 minutes
to her lower back.  After approximately one
hour, Dr. Mauti injected 6 cc's of Marcaine
and 2 cc's of Depromedrol into [Joanne's]
lower back (left side) at TAILS, L51S 1.  By
the end of her treatment, her pain decreased
to 5 or 6 out of 10.  At approximately 4:30
p.m., [Joanne] received Tizanidine (4 mg. by
mouth) and Ultracet (37.5/325 mg. by mouth).

Three years before the start of the trial, the State sought

a judicial declaration that defense counsel's description of the

medical treatment defendant provided to Joanne be admitted as an

adopted admission by defendant under N.J.R.E. 803(b)(3).

Specifically, the State sought to compare and contrast defense

counsel's description of the medications defendant administered

to Joanne with the findings of the forensic analyst reflected in

the March 2007 toxicology report of Joanne's urine.

The prosecutor wanted the jury to find that defendant

purposefully omitted chloral hydrate from the detailed list of

medications defense counsel claimed defendant administered to

Joanne because it revealed a "consciousness of guilt."  The

following excerpt from the prosecutor's summation illustrates this

point:

[T]he whole theory in the letter was side
effects that caused . . . hallucination, and
dreaming and he didn't think of the chloral
hydrate that he administered to [Joanne], yet
now all throughout the trial the defense is

69

the additive effect of the chloral hydrate caused hallucinations and dreaming.

What does that tell you about his consciousness of guilt when back in December [2009] he left it out?  He purposefully left it out.  What does that tell you about credibility?

The May 14th [2009] treatment history submitted, detailed down to the fact that he gave her cough syrup, yet no mention of the potent hypnotic sedative, no indication of [Joanne] passing out from the injection.

As he did before the trial judge, defendant argues in this appeal that the State should have been barred from using any statements of fact contained in defense counsel's letter because they were made as part of "plea negotiations" under N.J.R.E. 410. Defendant argues the letter falls within the purview of "plea negotiations" because it was intended: (1) to dissuade the prosecutor from pursuing an indictment; and (2) to provide exculpatory material that counsel believed the prosecutor was obligated to present to the grand jury under State v. Hogan, 144 N.J. 216 (1996).

On November 18, 2009, the trial court conducted an N.J.R.E. 104 hearing at which the defense attorney who authored the letter and the Assistant Prosecutor who received it testified.  Based on the evidence presented at this hearing, the trial judge issued a written opinion in which he made factual findings and explained

the legal basis for allowing the State to admit a redacted version of defense counsel's letter as an adopted admission by defendant under N.J.R.E. 803(b)(3).

The judge noted that at the time defense counsel sent this letter to the prosecutor: (1) defendant had not been charged with a crime; (2) the State did not ask for the letter; (3) the State had not extended a plea offer to defendant; (4) defendant had not offered to plead guilty to any particular offense; and (5) defense counsel wrote the letter "to demand that the State present the letter and attachments to the grand jury in accordance with [Hogan] and to convince the State not to charge [d]efendant with any crime."

With these findings as backdrop, the trial judge noted that no court in this State has addressed the question of determining the scope of plea negotiations under N.J.R.E. 410, which provides:

> Except as otherwise provided in this rule, evidence of a plea of guilty which was later withdrawn, of any statement made in the course of that plea proceeding, and of any statement made during plea negotiations when either no guilty plea resulted or a guilty plea was later withdrawn, is not admissible in any civil or criminal proceeding against the person who made the plea or statement or who was the subject of the plea negotiations. However, such a statement is admissible (1) in any proceeding in which another statement made in the course of the same plea or plea discussions has been introduced and the statement should in fairness be considered

contemporaneously with it, or (2) in a criminal proceeding for perjury, false statement, or other similar offense, if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

[(Emphasis added).]

In State v. Brabham, 413 N.J. Super. 196, 198 (App. Div.), certif. denied, 203 N.J. 440 (2010), we held that inculpatory statements made by the defendant during a meeting with the Assistant Prosecutor constituted "plea negotiations" under N.J.R.E. 410. We expressly relied on the following factual findings made by the trial court:

> [T]he presence of law enforcement officers at a meeting with defendant did not just happen but occurred because the meeting was orchestrated by defendant; defendant wanted to "run the show" and was "basically orchestrating what [was] going to happen"; he said "what he want[ed] to say"; and "[h]e wanted to orchestrate a deal . . . where everything was combined."
>
> [Id. at 208.]

We held these facts "do not permit any conclusion other than that defendant believed he was attending the meeting he wanted to have -- a meeting to negotiate a global plea agreement resolving multiple burglaries committed in various counties." Ibid. (emphasis added). Thus, we employed a fact-sensitive approach in Brabham to determine whether the defendant's belief that he engaged

in plea negotiations was supported by the trial court's factual findings.

More recently in State v. Williams, 444 N.J. Super. 603, 607 (App. Div. 2016), the prosecutor sought to use a statement the defendant had given during plea negotiations to impeach her credibility at trial. We were asked to determine whether a defendant could waive the protections afforded by N.J.R.E. 410. Id. at 606. We held a defendant can waive the protections under N.J.R.E. 410, but remanded for the trial court to determine in a hearing whether the defendant knowingly and voluntarily "waived that protection by agreeing her statement could be used against her at trial." Ibid.

Our analysis in Williams was guided by "'the source rule of N.J.R.E. 410,' namely the Federal Rule." Id. at 611 (citing State v. Malik-Ismail, 292 N.J. Super. 590, 597 (App. Div. 1996)). The question of whether a defendant could waive the protections afforded by Fed. R. Evid. 410 was answered by the United States Supreme Court in United States v. Mezzanatto, 513 U.S. 196, 197, 115 S. Ct. 797, 800, 130 L. Ed. 2d 697, 702 (1995). As we particularly noted in Williams, the Court in Mezzanatto determined that the "admission of plea statements for impeachment purposes enhances the truth-seeking function of trials and will result in more accurate verdicts." Williams, supra, 444 N.J. Super. at 612

(quoting Mezzanatto, supra, 513 U.S. at 204, 115 S. Ct. at 803, 130 L. Ed. 2d at 706).

We have not had occasion to consider what constitutes "plea negotiations" under N.J.R.E. 410 since our decision in Brabham. In fact, the analytical parameters for determining what constitutes "plea negotiations" have not been discussed in a published opinion by any court in the State. Thus, although the fact-sensitive approach we used in Brabham remains appropriate, it is not enough to answer the question before us. As the trial judge did here, we will follow the analytical approach we applied in Williams and Malik-Ismail and address the matter by reviewing how the federal courts have dealt with this issue.

In United States v. Edelmann, a jury convicted the defendant of two counts of mail fraud, 18 U.S.C.A. § 1341; two counts of wire fraud, 18 U.S.C.A. § 1343; and one count of money laundering, 18 U.S.C.A. § 1957. 458 F.3d 791, 798 (8th Cir. 2006). On appeal, defendant argued, inter alia, "the district court erred in refusing to suppress her incriminating statements[.]" Id. at 799. The Eighth Circuit noted that at the time the defendant made the incriminating statements "the government had not filed formal charges against [her], indicted her, filed an information against her, arraigned her, or instigated a preliminary hearing[.]" Id. at 804.

Against these facts, the Eighth Circuit noted that "[t]he plain language of [Rule] 410 excludes 'only those statements which are made in the course of plea discussions.'" Ibid. (quoting United States v. Hare, 49 F.3d 447, 450 (8th Cir. 1995)). Thus, "[s]tatements voluntarily offered either before any plea negotiation has begun or after a plea agreement has been reached cannot be considered statements made 'in the course of plea discussions' within the meaning of the exclusionary rules." Ibid. (quoting Hare, supra, 49 F.3d at 450).

The Edelmann court reaffirmed its prior decision, which listed the following factors to consider in determining whether a statement falls within the scope of plea negotiations under Federal Rule 410:

> (1) no specific plea offer was made;
>
> (2) no deadline to plead was imposed;
>
> (3) no offer to drop specific charges was made;
>
> (4) no discussion of sentencing guidelines for the purpose of negotiating a plea occurred -- only generalized discussion to give the suspect an accurate appraisal of his situation occurred; and
>
> (5) no defense attorney was retained to assist in the formal plea bargaining process.
>
> [Ibid. (quoting United States v. Morgan, 91 F.3d 1193, 1196 (8th Cir. 1996)).]

The Fifth Circuit Court of Appeals also provided an approach to this issue in <u>United States v. Robertson</u>, 582 <u>F.</u>2d 1356, 1366 (5th Cir. 1978). Under this two-tiered approach, a court must "determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." <u>Ibid.</u>

In <u>Robertson</u>, Drug Enforcement Administration (DEA) agents arrested defendant, another man, and two women when "various chemicals and laboratory equipment allegedly used in the preparation and manufacture of methamphetamine" were found in their residence. <u>Id.</u> at 1359. Shortly after the arrest, the two men had a conversation with DEA agents in the parking lot of the residence in which they "admitted their own complicity in order to exonerate the women." <u>Id.</u> at 1370.

In an en banc decision, the Fifth Circuit in <u>Robertson</u> held that "[s]uch a request, without more, does not transform a confession into a plea negotiation." <u>Id.</u> at 1368. "[The defendants] did not offer to plead guilty. They did not even contemplate pleading guilty." <u>Id.</u> at 1370. However, the Fifth Circuit did not find the absence of an offer to plead guilty to

be dispositive in determining whether the defendants' conversation with the DEA agents constituted plea negotiations.

> However, even assuming [a]rguendo, that there was bargaining and a government concession, the quintessential [q]uid of a plea negotiation [q]uid pro quo was missing. The only concession which [the two men] offered, and the only concession which the government received then, was a confession. [The two men] did not contemplate entering a plea of guilty in order to obtain the release of the women. A bargained confession, without more, is not a plea negotiation. Our emphasis will be on this aspect of the plea negotiation process; we focus on what [the two men] were contemplating conceding during the parking lot conversation.

> [Id. at 1369.]

The Ninth Circuit Court of Appeals has followed the Fifth Circuit's two-tier approach in Robertson. See, e.g., United States v. Pantohan, 602 F.2d 855, 857 (9th Cir. 1979) (The defendant's "statements were not made during plea negotiations" where he was not under arrest when he made them, there was no promise by the government "other than to tell the United States Attorney of the cooperation," and there was no plea offer or plea bargaining.). The Second Circuit Court of Appeals and district courts within that circuit have employed a similar analysis. See United States v. Levy, 578 F.2d 896, 900-01 (2d Cir. 1978); United States v. Stern, 313 F. Supp. 2d 155, 168 (S.D.N.Y. 2003); United States v.

Fronk, 173 F.R.D. 59, 67 (W.D.N.Y. 1997); United States v. Mannino, 551 F. Supp. 13, 18 (S.D.N.Y. 1982).

We are satisfied the two-tier approach followed by the Fifth Circuit in Robertson is consistent with both the reasonable expectations inherent in the plain language of N.J.R.E. 410 and the interest of justice. Here, the trial judge conducted an N.J.R.E. 104 hearing at which both defense counsel, as the author of the letter, and the Assistant Prosecutor, as its intended recipient, testified about their respective expectations. This approach is consistent with the fact-sensitive nature of the analysis required to reach a sustainable decision in this type of case.

Based on the testimonial evidence presented at this N.J.R.E. 104 hearing and the contents of the letter itself, the judge applied the two-tier approach in Robertson and found defendant had not met his burden of demonstrating "that this statement was made in the course of plea negotiation." However, in an implicit request for guidance from this court, the trial judge alternatively found "that the State had met its burden of proving that . . . [defense counsel's] letter was not sent out in the course of plea negotiation." Thus, by providing an alternative burden-of-proof analysis, the judge wisely placed the question of which party should bear the burden of proof squarely before this court.

The trial judge cited <u>United States v. Washington</u>, 614 <u>F. Supp.</u> 144 (E.D. Pa. 1985), in support of placing the burden on the State. In <u>Washington</u>, Judge Norma L. Shapiro noted that since the Fifth Circuit decided <u>Robertson</u>, the definition of "plea discussions" under Federal Rule 11(e)(6) was broadened to include "any statement made in the course of plea discussions." <u>Id.</u> at 150. Judge Shapiro thus concluded the government should bear the burden of proving a statement made by a defendant to a prosecutor concerning a possible resolution of pending criminal charges falls outside the inadmissibility protection of <u>Fed. R. Evid.</u> 410.

> A rule of presumed inadmissibility in the absence of an express Government disclaimer protects defendants whether with or without counsel from self-incriminating statements arguably "involuntary" because made in the misguided belief that they were given in exchange for possible Government concessions.
>
> [<u>Id.</u> at 151.]

We are persuaded by Judge Shapiro's reasoning that the State should bear the burden of proving defense counsel's letter did not constitute plea negotiations under <u>N.J.R.E.</u> 410. Placing the burden of proof on the State is consistent with our Supreme Court's long-standing policy favoring plea bargaining. Our Supreme Court has recognized plea bargaining as an indispensable, long-established, and ubiquitous means of reaching an honorable and just resolution of criminal cases. "[T]here is nothing unholy in

honest plea bargaining between the prosecutor and defendant and his attorney in criminal cases. At times, it is decidedly in the public interest, for otherwise, on occasion the guilty would probably go free." State v. Taylor, 49 N.J. 440, 455 (1967). "The prosecutor and defense attorney may engage in discussions relating to pleas and sentences and shall engage in discussions about such matters as will promote a fair and expeditious disposition of the case[.]" R. 3:9-3(a) (emphasis added).

Most recently, the Court reaffirmed its endorsement of plea bargaining as an indispensable part of our criminal justice system:

> Plea bargaining has become an important and now indispensable commonplace of our criminal justice system. It "is a legitimate, accepted practice in the administration of criminal justice [and the] system rests on the advantages both sides receive from it; and it depends on the good faith of both parties in carrying out the agreement struck—provided it is reasoned, fair, and approved by the trial court."
>
> [State v. Hess, 207 N.J. 123, 178 (2011) (quoting State v. Slater, 198 N.J. 145, 161 (2009)).]

N.J.R.E. 410 declares inadmissible a statement made by defendant "during plea negotiations when either no guilty plea resulted or a guilty plea was later withdrawn[.]" In our view, the inadmissibility protection afforded to a defendant under N.J.R.E. 410 must include all information of a self-incriminating

nature that a defendant provides to law enforcement "during plea negotiations." These negotiations can only occur in an environment that facilitates the exchange of information and promotes robust discussions that lead to a fair and just resolution of criminal charges, whether formally filed or merely contemplated.

We take judicial notice that most cases that are disposed of via plea bargaining are the product of direct, unambiguous negotiations between the prosecutor and defense counsel. R. 3:9-1(d). However, "plea negotiations" can take place anywhere and at any time. In fact, because plea negotiations can also take place between the prosecutor and a self-represented defendant, we have held that "as a matter of State law, any statement given in exchange for a prosecutor's promise of sentence during [uncounseled] plea negotiations on an indictable offense is inadmissible." State v. Watford, 261 N.J. Super. 151, 153 (App. Div. 1992).

Although the facts the trial judge found controlling here are not a common occurrence, they have revealed a fault-line in our legal landscape which requires our attention. We are satisfied the trial judge correctly held that defense counsel's May 14, 2007 letter to the prosecutor did not constitute plea negotiations under N.J.R.E. 410. Consequently, the trial court properly admitted the letter as an exception to the hearsay rule under

A-3551-12T3

N.J.R.E. 803(b)(3), which provides: "A statement offered against a party which is . . . a statement by a person authorized by the party to make a statement concerning the subject[.]"

Applying the two-tier approach in Robertson we conclude the trial judge did not abuse his discretion in admitting a redacted version of the letter under N.J.R.E. 803(b)(3). The record supports the judge's finding that defendant did not exhibit "an actual subjective expectation to negotiate a plea" at the time defense counsel sent the May 14, 2007 letter to the prosecutor, thus satisfying the first tier under Robertson, supra, 582 F.2d at 1366. As the following excerpt from the letter illustrates, defense counsel's expressed intent was to dissuade the prosecutor from bringing any criminal charges against defendant:

> I ask that before you proceed to present any charges that you consider the background information provided in the following sections. The facts and opinions which I will detail herein provide important, exculpatory information that, pursuant to State v. Hogan, 144 N.J. 216 (1996), must be presented to the grand jury before you consider any bringing [sic] charges against Dr. Mauti.

The second tier under Robertson required the trial judge to find that defendant's expectation of confidentiality under N.J.R.E. 410 "was reasonable given the totality of the objective circumstances." Ibid. An objective review of the contents of the letter supports the trial judge's conclusion that defense counsel

intended to prevent, not mitigate, criminal prosecution. The letter presented defendant's treatment history of Joanne to undermine her credibility and provide a medical basis to question her recollection of what transpired on November 25, 2006. The two expert reports attached to the letter were intended to convince the prosecutor she was legally bound to present this evidence to the grand jury under Hogan.[22]

Defense counsel's strategic decision to present this information to avoid the filing of formal criminal charges carried with it the inherent risk that any inaccuracy or omission could be used against defendant. The omission of chloral hydrate from the detailed and ostensibly complete list of medications defendant provided to Joanne was properly used by the prosecutor to impeach defendant's credibility and as substantive evidence under N.J.R.E. 803(b)(3).

We conclude our analysis with the following point of caution concerning adoptive admissions in the form of statements made by defense counsel. As much as possible, such adoptive admissions should be tailored to avoid attributing the statement to defense

---

[22] "In order to perform that vital protective function, the grand jury cannot be denied access to evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a prima facie case against the accused." Hogan, supra, 144 N.J. at 236.

counsel. While defense counsel in these circumstances will have communicated the statement, the statement is admitted as an adoptive admission against the defendant. Thus, the distinction between defendant and his defense counsel should be protected as much as possible. In most circumstances, such statements can be tailored or redacted so that the jury is not informed that the statement came from defense counsel. Such tailoring is particularly important when defense counsel remains as counsel during the trial. Here, for example, if the excerpt from the letter is used at a re-trial, the letter should be redacted so that it does not reflect that it came from defense counsel. The jury can be told simply that the statements in the letter are attributable to defendant.

## VI

### SUMMARY AND CONCLUSION

We reverse the trial court's decision to admit into evidence a towel stained with defendant's semen. Under the circumstances, the towel should have been excluded as nonverbal conduct under N.J.R.E. 801(a)(2). The towel was also irrelevant under N.J.R.E. 401 because it was not linked to any specific aspect of the alleged sexual assault.

We also conclude the trial court erred in permitting the State to call a total of five witnesses to provide fresh-complaint

testimony. The cumulative effect of these witnesses' testimony had the capacity to unduly bolster the credibility of the complaining witness. The trial judge compounded this error by sua sponte deciding at the charge conference not to instruct the jury on how to consider and apply the fresh-complaint testimony.

Finally, we affirm the trial judge's decision to admit a letter written by defense counsel as an adopted admission by defendant under N.J.R.E. 803(b)(3). Consequently, we reject defendant's argument that the letter should have been excluded as "plea negotiations" under N.J.R.E. 410. As a matter of first impression, we adopt the two-tier approach established by the Fifth Circuit Court of Appeals in Robertson, supra, 582 F.2d at 1366, to determine when communications between a defendant and a prosecutor falls within the purview of plea negotiations under N.J.R.E. 410. We also hold the State has the burden of proof when an inculpatory statement is challenged as inadmissible under N.J.R.E. 410.

We reverse defendant's conviction and remand the matter for a new trial. Defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3551-12T3